751 So.2d 998 (2000)
Philip LACOSTE, et al.
v.
Barry L. CROCHET, et al.
No. 99-CA-0602.
Court of Appeal of Louisiana, Fourth Circuit.
January 5, 2000.
*1000 Robert G. Harvey, Harvey Jacobson, APLC, New Orleans, Louisiana, Counsel for Plaintiffs/Appellees.
Michael Frederick Grennan, Waller & Associates, Metairie, Louisiana, Counsel for Defendants/Appellants.
David J. Mitchell, Porteous, Hainkel, Johnson & Sarpy, New Orleans, Louisiana, Counsel for State Farm Mutual Automobile Insurance Company.
Court composed of Judge MOON LANDRIEU, Judge MICHAEL E. KIRBY, Judge ROBERT A. KATZ.
LANDRIEU, Judge.
Defendants, Kelley Completion Services/Production Systems, Inc. ["Kelley"] and Travelers Insurance Company ["Travelers"], appeal suspensively from the trial court's judgment awarding plaintiffs compensatory and punitive damages as a result of an automobile accident. Defendant State Farm Mutual Automobile Insurance Company ["State Farm"] has answered the appeal alleging the trial court erred in failing to recognize its cross claim for reimbursement.

FACTS
On October 14, 1995, plaintiff Phillip Lacoste was driving his car with four passengers inside on Old Gentilly Road when a truck travelling in the opposite direction suddenly attempted to turn left in front of him and hit his vehicle on the left rear side. The Lacoste vehicle fishtailed before coming to a complete stop. The truck, driven by defendant Barry Crochet, pulled into the parking lot of the Pizza Hut into which Crochet had intended to turn.
The passengers in the Lacoste vehicle included Phillip's wife, Judy Lacoste, their two minor children, James and Brittany Lacoste, and another adult, David Williams. After the impact, the three adults exited the Lacoste vehicle and *1001 walked over to talk with Barry Crochet. Crochet, whom the plaintiffs testified was stumbling and smelled of alcohol, was in a hurry to go into Pizza Hut to use the restroom. Crochet offered the Lacostes money to settle the accident without calling the police, saying he could not afford to hang around and wait for the police because he feared being sent to jail for another DWI. Crochet also said he was working, and handed Phillip Lacoste his Louisiana identification card and a business card with "Kelley Completion Services/PSI" printed on it. Crochet then left the scene.
The five persons in the Lacoste vehicle were each injured in the accident. Phillip Lacoste suffered back and neck injuries; Judy Lacoste suffered lower back, hip and leg injuries; the two children had leg and back injuries; and David Williams, who was seated in the back closest to the point of impact, injured his knee, hand and neck.
On March 16, 1996, plaintiffs filed suit against Barry Crochet, "Kelley Completion Services Production Systems, Inc." and its insurer, Travelers, alleging that Crochet was in the course and scope of his employment with Kelley at the time of the accident. Barry Crochet was never served, nor did he appear. Kelley and Travelers answered, denying liability for the actions of Crochet. Plaintiffs then filed an amended petition adding State Farm, their uninsured motorist carrier, as defendant. State Farm answered and filed a cross claim against the other defendants for reimbursement of any amount it might pay the Lacostes under its policy.
Trial was held on July 30, 1998, in First City Court. The only witnesses were the three adult plaintiffs and Mr. Louis Gueniot, Jr., the general manager of Production Systems, Inc. On November 24, 1998, the trial judge rendered judgment in favor of plaintiffs against Kelley and Travelers in the following amounts:

David Williams ---------------$16,956.00
Phillip Lacoste --------------$ 2,668.00
Judy Lacoste -----------------$ 7,658.50
James Lacoste ----------------$ 4,296.50
Brittany Lacoste -------------$ 1,365.00

The trial judge also awarded the plaintiffs $50,000.00 under article 2315.4 of the Louisiana Civil Code, which provides for exemplary damages in cases where the defendant's intoxication while operating a motor vehicle is found to be a cause in fact of the plaintiff's injuries.
In written reasons for judgment, the trial judge stated that the sole cause of the accident was the negligence of Barry Crochet, for which his employer was vicariously liable because Crochet was "on call" on the day of the accident, a Sunday. The trial judge found that Mr. Crochet was staying in a company apartment that weekend while he awaited notification as to whether he was needed for a job with Texaco; that he had met with one of his supervisors, Bruce Gueniot, on Saturday to get an advance on his paycheck; and that Gueniot knew or should have known Crochet was driving the company truck. Additionally, the trial judge stated that the issue of exemplary damages had been properly raised at trial and that the evidence warranted such an award. According to the trial judge, he had "no doubt in [his] mind" that Barry Crochet was intoxicated and that his intoxication was a contributing factor in causing the accident. Concerning the amount of punitive damages, the trial judge noted that Crochet's actions had injured five people, including small children, and that his was exactly the type of reckless behavior which article 2315.4 was designed to deter.
After denying defendants' motion for new trial (which asserted that the punitive damages award exceeded the jurisdictional limits of the court), the trial judge issued an amended judgment distributing the $50,000.00 punitive damage award among the five plaintiffs, as follows[1]:

*1002
 Compensatory Exemplary Total
David Williams $16,956.00 $ 3,044.00 $20,000.00
Phillip Lacoste $ 2,668.00 $11,739.00 $14,407.00
Judy Lacoste $ 7,658.50 $11,738.50 $19,397.00
James Lacoste $ 4,296.50 $11,739.00 $16,035.50
Brittany Lacoste $ 1,365.00 $11,739.00 $13,104.00
TOTAL $32,944.00 $49,999.50* $82,943.50

ISSUES
On appeal, the primary issue is whether the trial judge erred in concluding that Barry Crochet was in the course and scope of his employment at the time of the accident, and that therefore the defendants are vicariously liable for his negligence. Assuming that the court did not so err, other issues to be considered are whether the punitive damage award is appropriate and whether the judgment should have recognized State Farm's right to reimbursement.

VICARIOUS LIABILITY
The trial judge's findings in this regard are subject to review according to the manifest error standard. Brightman v. Regional Transit Authority, 543 So.2d 568 (La.App. 4th Cir.1989). The question of whether an employee's conduct is sufficiently employment-related for the court to impose vicarious liability on the employer is a mixed question of fact and law, and the trial court's resolution of that question is entitled to great deference on review by the appellate court under the manifest error standard. Russell v. Noullet, 98-0816 (La.12/1/98), 721 So.2d 868.
After reviewing the evidence, we find no manifest error in the trial judge's conclusions that Barry Crochet was a permissive user of the truck and that he was on call at the time of the accident.
Louis Guenoit, general manager of Production Systems, Inc., testified that Kelley Completion Services and Production Systems, Inc. were two separate entities which were owned by the same person, shared the same office and business cards, and trained each other's employees. In fact, according to the documentary evidence, Production Systems, Inc. is a wholly owned subsidiary of Kelley Completion Services. Barry Crochet was actually employed as a roustabout by Production Systems, Inc. Guenoit stated that the company sometimes furnished its truck to transport the roustabouts to certain jobs. In those instances, the roustabouts were paid for their travel time. In this case, a company truck was furnished for Barry Crochet and fellow employee Lynwood Neal to go to a job in Leeville on Friday morning. According to Guenoit, another supervisor actually handed the keys to Crochet, but it was understood that they were to be given to Neal to drive the truck. Because the men were returning after the office closed on Friday and were waiting to hear if they would be needed for a Texaco job over the weekend, they were allowed to stay at the company apartment. Employees staying at the company apartment were generally allowed to use the truck to go get food and other necessary items. The plaintiffs testified that when he hit them, Crochet was driving a white truck with "Kelley" printed on the side. As Crochet did not testify, there was no evidence as to where he was going in the truck at the time of the accident, except that he apparently intended to enter the Pizza Hut restaurant.
Although Louis Guenoit testified that only Lynwood Neal was authorized to drive the truck in this instance, he could produce no documentary evidence of this fact. In practice, all employees were allowed to drive the trucks; Guenoit could *1003 not name one employee who was excluded. He did testify that if an employee was authorized to drive, his driver's license should be on file, which Barry Crochet's was not. However, Travelers was never notified that Crochet was not a permissive user of the company vehicles.
Guenoit also testified that his brother Bruce Guenoit, Barry Crochet's supervisor, had telephoned Crochet and Neal either Friday night or Saturday morning and told them they were free to go because they would not be needed for the Texaco job. However, this statement was shown to be inconsistent with the witness's earlier written statement, placed in Crochet's file, indicating the men would be in the apartment over the weekend.
The trial judge was apparently persuaded by two facts to disregard Louis Guenoit's testimony that Barry Crochet was not authorized to use the truck on Sunday, the day of the accident. First, supervisor Bruce Guenoit must have known Barry Crochet was driving the truck over the weekend because he met with Crochet on Saturday morning "at the yard" to give him an advance on his paycheck., and he had to know Crochet was using the truck at that time. Secondly, as the trial judge stated in his reasons for judgment, Louis Guenoit's testimony that there was a driver's license on file for Lynwood Neal but not for Barry Crochet was not credible in view of the fact that the only license in Neal's file was dated 1997, two years after the accident. Because Neal was let go by the company after the accident and then rehired during the pendency of this litigation, the trial judge found it "frankly unbelievable" that they [company supervisors] would have thrown away the old copy of Neal's license if one had in fact been in his file. The judge therefore concluded that at the time of the accident, there was no license in either Crochet's or Neal's file, and therefore no reason for Guenoit to give permission for Neal to drive and withhold permission from Crochet.
An accident may be held to be within the course and scope of an employee's employment if (1) the employer provides transportation the employee uses to go to and from work; (2) the employer provides wages or expenses for the time spent traveling in the vehicle; and (3) the operation of the vehicle is incidental to the performance of some employment responsibility. Vaughan v. Hair, 94-86 at p. 4 (La.App. 3 Cir. 10/5/94), 645 So.2d 1177, 1180, writ denied, 95-0123 (La.3/10/95), 650 So.2d 1186. Previously, the courts have held employers liable for automobile accidents caused by their employees who were driving home from work, but who remained "on call." See, e.g.: Soileau v. D.J. Tire, Inc., 97-318 (La.App. 3 Cir. 10/8/97), 702 So.2d 818, writ denied, 97-2737 (La.1/16/98), 706 So.2d 979; Watson v. Ben, 459 So.2d 230 (La.App. 3 Cir.1984). The trial judge's determination that Crochet was on call over the weekend is a factual determination based on the credibility of the witnesses, and one which we find reasonable in light of the evidence. We therefore find no manifest error in the trial court's conclusion holding the employer of Barry Crochet vicariously liable for his negligence in this case.

EXEMPLARY DAMAGES
Defendants contend that the trial court erred in awarding exemplary damages under article 2315.4 because plaintiffs failed to prove that Barry Crochet was legally intoxicated and that his intoxication was a cause of the accident. La. Civ.Code art. 2315.4 provides:
In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries.
Recently, this court held that an intoxicated driver's employer, when held *1004 vicariously liable for damages caused by the driver, may be cast for exemplary damages under article 2315.4. Curtis v. Rome, 98-0966 to 98-0970 (La.App. 4 Cir. 5/5/99), 735 So.2d 822, writ denied, Rambo v. Rome, 99-1617 (La.10/1/99), 748 So.2d 441.
In the instant case, David Williams testified that immediately after the accident, Barry Crochet was stumbling like he was drunk, smelled of alcohol, had weak and blurry eyes, and could hardly stand up. Judy Lacoste said Crochet was stumbling, smelled like strong alcohol, and had "glassy" eyes. Similarly, Phillip Lacoste said Crochet did not act "normal," smelled like alcohol, and had eyes "shining like glass." All three witnesses said Crochet told them he was in a hurry to get into Pizza Hut to use the bathroom, and he did not want them to call the police because he had a prior DWI arrest and feared he would be taken to jail. Because Crochet fled the scene, there was no evidence that he was legally intoxicated, such as breath test results.
Defendants contend that the absence of such evidence, coupled with the fact that the testimony of the witnesses was self-serving, means that there was insufficient proof of Crochet's intoxication and/or of the fact that his intoxication contributed to the accident. We disagree. In Owens v. Anderson, 93-1566 (La.App. 4 Cir. 1/27/94), 631 So.2d 1313, writ denied, 94-0462 and 94-0494 (La.4/7/94), 635 So.2d 1135, this court rejected the argument that damages should not have been awarded under article 2315.4 in the absence of medical testimony indicating the defendant's blood alcohol level as proof of intoxication. In that case, the court stated:
While most of the reported C.C. Art. 2315.4 cases included a blood alcohol level because a driver was tested and ticketed by the police, in cases such as the instant one where the driver fled the scene and was not apprehended or otherwise timely tested, blood alcohol evidence is not available. Does this mean that all an intoxicated driver need do to avoid 2315.4 liability is to successfully flee the accident scene? We think not.... Blood alcohol level is not the only way in which intoxication can be established in a civil case. The triers of fact can look to the totality of the circumstances....
Owens, supra, 631 So.2d at 1317-1318. The Owens court went on to hold that testimony indicating that the driver was swerving and driving erratically, that he smelled of beer, that he was drinking from a beer can immediately after the accident, that he did not want the police called, and that he fled the scene, was sufficient evidence upon which the trier of fact could base a finding of intoxication. Id. at 1318.
In the instant case, the three adult plaintiffs all testified that Barry Crochet was stumbling, glassy-eyed, smelled of alcohol, was in a hurry to get to a bathroom, did not want the police called, and fled the scene. This testimony, albeit self-serving, was consistent and uncontroverted, and the trial judge apparently considered it credible. In addition, the evidence showed that Crochet caused the accident by turning left into plaintiffs' vehicle, which had the right of way. Under the circumstances, we do not find manifest error in the trial judge's conclusions that Barry Crochet was intoxicated and that his intoxication contributed to the accident.
Turning to the amount of exemplary damages, we must consider whether the trial judge abused his discretion in awarding $50,000.00. Recent decisions of this court have affirmed exemplary damage awards under article 2315.4 ranging from $10,000.00 in a case with a general damage award of $125,000.00 [Hanson v. Benelli, 97-1467 (La.App. 4 Cir. 9/30/98), 719 So.2d 627, writ denied, 98-2754 (La.1/8/99), 735 So.2d 632] to $850,000.00 in a case with a general damage award of $500,000.00 [Dekeyser v. Automotive Casualty Ins. Co., 97-1251 (La.App. 4 Cir. 3/16/98), 706 *1005 So.2d 676]. In Dekeyser, the twenty-year-old plaintiff suffered a broken neck in the accident. Despite that decision, however, our review of the jurisprudence applying article 2315.4 has shown that it is extremely rare for the amount of exemplary damages awarded to exceed the total amount of compensatory damages in a case.
The First Circuit has noted that the factors relevant in determining the amount of exemplary damages are: (1) the nature and extent of the harm to the plaintiff(s); (2) the financial situation of the defendant; (3) the character of the conduct involved; and (4) the extent to which the conduct offends a sense of justice and propriety. Angeron v. Martin, 93-2381 at pp. 5-6 (La.App. 1 Cir. 12/22/94), 649 So.2d 40, 44. In the instant case, Crochet's apparently reckless driving injured five people, including two children. However, with the exception of David Williams, each person's injuries were resolved within six months by means of conservative medical treatment, which consisted primarily of pain medication and physical therapy. Mr. Williams was also released by his treating physician in six months, but was still complaining of residual pain in his knee. His treating physician recommended that he consult an orthopedist, but Mr. Williams testified he was unable to do so.
The total amount of compensatory damages for the five plaintiffs is approximately $33,000.00, which amount has not been challenged on appeal. As the defendant in the instant case is Barry Crochet's employer, there was no evidence indicating that the financial situation of the defendant should be a limiting factor in determining the amount of exemplary damages. Nevertheless, we believe the amount awarded was an abuse of discretion considering the nature and extent of the injuries caused. There are no circumstances in this case which would justify an exemplary damage award greater than the total amount of compensatory damages. Therefore, we hold that the greatest amount of exemplary damages reasonably within the discretion of the trial court to award is $30,000.00.
In its amended judgment, the trial court distributed the exemplary damages unevenly among the five plaintiffs in order to avoid exceeding the jurisdictional limits of First City Court. As a result, the least injured parties each received a greater amount in punitive damages than did David Williams, the most severely injured party. We find this distribution to be arbitrary and capricious, and therefore an improper exercise of the trial court's discretion. We therefore reduce the exemplary damage award to $30,000.00, to be distributed evenly among the plaintiffs, each receiving $6,000.00. In the case of David Williams, the jurisdictional limitation of the trial court ($20,000.00) will prevent recovery of the entire amount. This result, however, is proper because the plaintiffs freely chose to file suit in a court of limited jurisdiction. Accordingly, the total amount of damages awarded are reduced as follows[2]:

 Compensatory Exemplary Total
David Williams $16,956.00 $ 6,000.00 ($3,044.00)* $20,000.00
Phillip Lacoste $ 2,668.00 $ 6,000.00 $ 8,668.00
Judy Lacoste $ 7,658.50 $ 6,000.00 $13,658.50
James Lacoste $ 4,296.50 $ 6,000.00 $10,296.50
Brittany Lacoste $ 1,365.00 $ 6,000.00 $ 7,365.00
TOTAL $32,944.00 $30,000.00 ($27,044.00)* $59,988.00

*1006 STATE FARM'S CROSS CLAIM
State Farm contends the trial court erred in failing to recognize its right to reimbursement of the $2,000.00 it paid to its insured, Phillip Lacoste, in settlement of his uninsured motorist claim. According to La. R.S. 22:1406(D)(4), an insurer who has paid any person under uninsured motorist coverage is entitled to reimbursement from the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of that person against any other person or organization responsible for the bodily injury for which such payment has been made. Under the law, State Farm is subrogated to the rights of Phillip Lacoste against the tortfeasors, Kelley and Travelers, for the amount paid under its policy, or $2,000.00. The record reflects that State Farm properly introduced this issue at trial and put into evidence the documents supporting its claim. Accordingly, we find that the trial court erred in failing to recognize State Farm's right of reimbursement. We therefore reduce the award to Phillip Lacoste by the sum of $2,000.00, making his compensatory damage award $668.00 and his punitive damage award $6.000.00, for a total of $6,668.00, plus costs and interest. We also award the sum of $2,000.00, plus costs and interest, to State Farm.

CONCLUSION
For the reasons given, the judgment of the trial court is amended as stated herein, and is affirmed as amended.
AMENDED AND AFFIRMED.
KATZ, J., CONCURS WITH REASONS.
KATZ, J., concurring.
I concur with the results of the majority opinion but disagree with the citation of the First Circuit decision in Angeron v. Martin, 93-2381 (La.App. 1 Cir.12/22/94), 649 So.2d 40 insofar as it lists the defendant's wealth or financial condition as one of several factors to be considered in determining the amount of punitive or exemplary damages to be awarded in any given case.[3]
The First Circuit in Angeron, supra, relied on an earlier First Circuit case  Jordan v. Intercontinental Bulktank Corp., 90-CA2146 (La.App. 1 Cir.1993), 621 So.2d 1141, 1157, rehearing denied (April 28, 1993), writs denied (La.09/17/1993) as authority for the factors to be considered in awarding punitive damages.
Moreover, in a recent case the First Circuit reiterated its prior position in Angeron, supra, i.e.: "When liability for exemplary damages is at issue, the wealth or financial situation of the defendant-tortfeasor is a relevant factor in determining the amount of any award. Other relevant factors include, the nature and extent of the harm to the plaintiff; the character of the conduct involved; and the extent to which such conduct offends a sense of justice and propriety." Bienvenu v. Dudley, 95-CA-0547 (La.App. 1 Cir.10/03/1996), 682 So.2d 281, 284-5, writ denied (La.12/13/1996), citing Angeron, supra, and Jordan, supra, at 284-5. In fact, the trial court in the Bienvenu case had refused to permit the plaintiff to introduce evidence of Dudley's financial condition on the rationale that: "exemplary damages should serve to penalize egregious conduct and should not be linked to a defendant's ability to respond in damages." Bienvenu, supra, p. 284. While I may personally agree with the ruling by the trial court, the appellate court nevertheless followed its prior rulings *1007 in Angeron, supra, and Jordan, supra, and concluded that the trial court erred by not admitting evidence of Dudley's financial condition.
The Fourth Circuit in Mistich v. Pipelines, Inc., 89-CA-1420 (La.App. 4 Cir. 11/17/1992), 609 So.2d 921, 937, rehearing denied (12/16/1992), writ denied (La.03/12/1993), equivocated on whether or not the trial court erred when it "refused to let plaintiff introduce a financial statement reflecting the earnings of Brown & Root and its percentage of earnings in relation to its parent corporation, Halliburton & Company." Mistich, supra, at p. 937. In fact, the trial court had awarded the plaintiff $4,000,000.00 in punitive damages and the plaintiff continued to argue that it wasn't enough and sought to introduce evidence of the earnings of B & R to support an increase in the award. The court of appeal had the opportunity to establish a bright line rule regarding the use of the financial condition of the defendant in determining an appropriate award for punitive damages but instead sidestepped the issue by stating: "we are unable to say that consideration of that evidence (financial condition of B & R) warrants an increase in the trial court's award of punitive damages." Mistich, supra, p. 937.
It should also be noted that in each of the foregoing cases from the First and Fourth Circuits the Louisiana Supreme Court denied writs.[4] Thus, for whatever reason(s) it appears that the Supreme Court has decided for the time being to take a laissez faire approach to the problem and let the circuit and district courts wrestle with the issue of punitive damages and the defendant's financial condition on their own. Obviously, when the propitious moment does arrive, the Supreme Court will grant writs and determine if and under what conditions the defendant's financial status will be admissible to establish an award for punitive damages.
87 ALR 4th 141-253 discusses the relationship between "Punitive Damages" and the "Wealth Factor":
"It is virtually a universal view that the purpose of punitive damages is to punish the defendant and deter others from committing like offenses. In assessing punitive damages, the trier of fact should consider the nature, extent, and enormity of the wrong, the intent of the party committing it, and, generally, all of the circumstances attending the particular occurrence, including any mitigating circumstances which may operate to reduce the award without wholly defeating it.
The vast majority of courts which have considered the issue of whether the trier of fact may also consider the wealth of the defendant in fashioning a punitive award have determined that the defendant's wealth is an appropriate consideration because the degree of punishment or deterrence is to some extent proportionate to the means of the wrongdoer. The Restatement of Torts supports the majority position, stating that in assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause, and the wealth of the defendant. (p.151) Some courts have taken the position that the finder of fact must consider the wealth of the defendant in determining the appropriate amount of punitive damages. Many other jurisdictions, however, *1008 have considered evidence of the defendant's wealth to be a relevant factor, although not a mandatory one, in assessing the appropriateness of a punitive damage award. (p.152)
(However) In those jurisdictions which have permitted evidence of the defendant's wealth for the purpose of arriving at an award of punitive damages, the courts have not arrived at a consistent standard for measuring the appropriateness of a punitive award...Some courts have also required the quantum of punitive damages to bear a reasonable relationship to the amount of compensatory damages awarded in the case. (p.152)
Some courts have measured the appropriateness of punitive damages by comparing the damage award with the amount of an individual defendant's salary or wages when the amount of the defendant's net worth or assets has not been disclosed. (p.154)
Other courts have recognized that punitive damages must bear some relationship to the actual wealth of the defendant....(since)punitive damages is in part determined by its deterrent effect, it must therefore bear some relationship to the size of the tortfeasor's wealth....(in one case) the lack of evidence of the defendant's financial condition necessitated a remand...(p.165) (other courts) have reasoned that to punish for past misconduct and to prevent future like offenses, (can) only be accomplished if the punitive award was to some extent proportional to the means of the guilty person.(p.166).* * * * (In fact one court stated) that the deterrence function of punitive damages cannot be served if the wealth of the defendant allows absorption of the award with little or no discomfort (p.178) * * * (Another court stated) that the wealthier the wrongdoer, the larger the award of exemplary damages need be in order to accomplish the objectives of punishment and deterrence. The court cautioned, however, that these goals are not served by an award that financially destroys the defendant * * * (And another court) held that it was error to instruct the jury that the greater the defendant's wealth, the greater must be the punitive damages. (p.179) * * * *
Some courts have prohibited the trier of fact from considering such evidence in determining the amount of the award. (p.152)
(In those cases which hold that the) wealth or poverty of the defendant could not be considered by the jury in assessing punitive damages (the rationale varies): `the use of such evidence to inflate the amount of punitive damages when the defendant is wealthy would require the introduction of evidence to mitigate the amount of damages where the defendant is not of substantial means...insolvent tortfeasors could perpetrate their wrongs with comparative impunity' (p.182); In its reversal the court cited a long line of cases wherein courts refused to consider the defendant's financial circumstances in determining the amount of either compensatory or punitive damages (p.183); (another court ) held that neither the plaintiffs nor the defendant's financial circumstances are admissible to aid the fact-finder in assessing punitive damages....such testimony would focus the jury on the defendant's financial condition, while distracting it from considering the severity or wantonness of the defendant's act (p.183); (and another court reasoned that) the introduction of evidence of a corporate defendant's wealth would only create collateral issues and confuse the jury. According to the court, to determine the defendant's financial situation would require far more than a presentation of the defendant's balance sheet and statement of profits and losses to the jury. The court stated that there were too many variables involved in modern accounting techniques to make an accurate presentation of the defendant's financial *1009 status without detailed analysis." (p.184).[5]
The Supreme Court in Rodriguez v. Traylor, 85-C-0044, 468 So.2d 1186 (La. 1985) overruled a century-old doctrine that had permitted a defendant to mitigate his damages by pleading and putting on evidence of his financial inability to respond to compensatory damages.
Historically, this "inability to pay" rule originated in Williams v. McManus, 38 La. Ann. 161 (1886) and Loyacano v. Jurgens, 50 La. Ann. 441, 23 So. 717 (1898) and had been applied by Louisiana courts ever since. The rationale for this jurisprudentially created rule is found in Cole v. Sherrill, 7 So.2d 205 (La.App. 2d Cir.1942):
"It has never been good policy to bankrupt one to pay another even though the award granted is not in line with other cases involving the same injuries and might not fully compensate the plaintiff for injuries he received. Fair justice between both parties must be arrived at. (7 So.2d at 211)." Traylor, supra, 1188.
The Supreme Court in Rodriguez, supra at p. 1188, went on to say:
"While Louisiana has begun to restrict the inability to pay doctrine, other jurisdictions have never sanctioned its use. In Laidlaw v. Sage, 158 N.Y. 73, 52 N.E. 679 (App.Div.1899), the court stated:
"It has ever been the theory of our government, and a cardinal principal of our jurisprudence, that the rich and poor stand alike in courts of justice, and neither the wealth of one nor the poverty of the other shall be permitted to affect the administration of the law." Traylor, p.1188.
* * * * * * * *
While we are hesitant to overrule a longstanding jurisprudential rule, after careful consideration, we feel that the wealth or poverty of a party to a lawsuit is not a proper consideration in the determination of compensatory damages. Each litigant should stand equal in the eyes of the law regardless of his financial standing. When the inability to pay rule originated in this State there were no bankruptcy laws in effect and a defendant was subject to losing virtually everything he owned. While the policy behind the inability to pay rule, to prevent the bankruptcy of a defendant, is still a valid concern, with todays modern bankruptcy courts and extensive protections to defendants by virtue of the bankruptcy laws, we feel that this is a more proper consideration for bankruptcy courts and experienced bankruptcy judges rather than a jury which has no expertise in the modern day protections for those who are forced to declare bankruptcy. See La.R.S. 13:3881. We therefore conclude that the trial court should not have permitted the jury to hear evidence of the defendant's inability to pay." Traylor, p. 1188.
In my humble opinion, the reasoning by the Louisiana Supreme Court to overrule the "inability to pay" doctrine is just as apropos to the exclusion of the defendant's financial condition in determining an award for punitive damages. Additionally, I agree with the reasoning in the various opinions found in 87 ALR 4th 141-253 which uphold the exclusion of the defendant's financial condition in the determination of punitive damages.
However, until the Supreme Court decides it's a priority issue and makes a definitive ruling on the use of the defendant's financial condition vis a vis punitive damages, other judges and courts are free to choose from the various choices set forth in 87 ALR 4th.
For the foregoing reasons, I concur with the results of the majority opinion but dissent from using the Angeron decision as a basis for permitting a plaintiff to put a *1010 defendant's financial condition before the fact finder in determining an award for punitive damages.
NOTES
[1] As denoted by the (*), the trial judge actually awarded $49,999.50 rather than $50,000.00 in exemplary damages.
[2] As denoted by the (*)'s, David Williams's exemplary damages award must be capped at $3,044.00 so that his total award will not exceed the $20,000.00 jurisdictional limitation of First City Court.
[3] I have no problem with the other factors listed in Angeron for consideration in determining an award for punitive damages, i.e., "the nature and extent of the harm to the plaintiff"; "the character of the conduct involved"; and "the extent to which such conduct offends a sense of justice and propriety". Angeron, supra, p. 44.
[4] The Supreme Court "is not bound by its refusal of writs, to adopt law expressed in appellate court opinions. Garlington v. Kingsley, 289 So.2d 88, 92 (La.01/14/1974)", Colonial Pipeline v. Agerton, 289 So.2d 93, 96 (La.01/14/1974), rehearing denied (02/15/1974). See also Liedtke v. Allstate, 405 So.2d 859, 875 fn. 5 (La.App. 3 Cir.1981), rehearing denied in part and granted in part, writ denied (La.12/14/1981): "A writ denial does not imply approval of the judgment of the Court of Appeal. White v. La. Western Ry., 174 La. 308, 140 So. 486 (La.1932); Lombardo v. Argonaut Ins. Co., 354 So.2d 731 ([La. App.] 4 Cir.1978), writ denied, 355 So.2d 1325 (La.1978)."
[5] As the late "philosopher/lawyer" Gibson Tucker was fond of saying, "there's something in the law for everybody."